## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| MARTIN J. WALSH, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | : <br> : <br> : CIVIL ACTION NO. 2:22-cv-00371 <br> : |
| Plaintiff, | : |
| v. | : |
| CHARLES HATFIELD AND WILLIAMSON MEMORIAL HOSPITAL, LLC EMPLOYEE BENEFIT PLAN, | : <br> : <br> : |
| Defendant(s). | : |

## COMPLAINT

Plaintiff, Martin J. Walsh, the Secretary of Labor (the "Secretary"), hereby alleges:

### Jurisdiction and Venue

1. This cause of action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and is brought by the Secretary under Sections 502(a)(2) and (5) of ERISA, 29 U.S.C. §§ 1132(a)(2) and (5), to enjoin acts and practices which violate the provisions of Title I of ERISA, to obtain appropriate relief for breaches of fiduciary duty under ERISA Section 409, 29 U.S.C. § 1109, and to obtain such other further relief as may be appropriate to redress violations and enforce the provisions of Title I of ERISA.

2. This Court has subject matter jurisdiction over this action pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1).

3. Venue with respect to this action lies in the Southern District of West Virginia, pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2) because the Williamson

Memorial Hospital, LLC Employee Benefit Plan was administered in Williamson, Mingo County, West Virginia, within this district.

## The Parties

4. The Secretary, pursuant to Sections 502(a)(2) and (5) of ERISA, 29 U.S.C. §§ 1132(a)(2) and (5), has the authority to enforce the provisions of Title I of ERISA by, among other means, the filing and prosecution of claims against fiduciaries and others who commit violations of ERISA.

5. The Williamson Memorial Hospital, LLC Employee Benefit Plan ("Plan" or "Health Plan") is an employee benefit plan within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3) that offers health and welfare benefits to its participants who are employees of Williamson Memorial Hospital, LLC ("WMH"), and therefore the Plan is subject to the coverage of the Act, pursuant to Section 4(a) of ERISA, 29 U.S.C. § 1003(a). The Plan is joined as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

6. At all relevant times, Charles Hatfield ("Hatfield") was the CEO of WMH. At all relevant times, Hatfield had discretionary authority and discretionary control respecting management of the Health Plan, exercised authority and control respecting management and disposition of the Health Plan assets and had discretionary authority and discretionary responsibility in the administration of the Health Plan. Hatfield, therefore, is a fiduciary of the Health Plan within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(21), and a party-in-interest as that term is defined in Sections 3(14) (A) and (H) of ERISA, 29 U.S.C. §§ 1002(14) (A) and (H).

**Factual Allegations**

7. At all relevant times, Williamson Memorial Hospital, LLC ("WMH" or the "Company") has been the Plan's Sponsor and is named in the Plan documents as the Plan Administrator. WMH was a 76-bed rural hospital located in Williamson, West Virginia, a town of 2,800 people. The Company opened its facility in 1918 and was the only hospital in Mingo County, West Virginia. The Company filed a petition for bankruptcy under Chapter 11 on October 21, 2019 in the Southern District of West Virginia at case number 19-20469. The Company's motion to convert the bankruptcy to Chapter 7 was granted on January 29, 2021.

8. The Company is the Plan Sponsor and named Plan Administrator of the Health Plan. The Company established the Health Plan as a fully-insured health and welfare plan offered to all eligible employees beginning June 1, 2018. The fully-insured contract was cancelled as of June 30, 2018, and the Plan became a self-insured health plan offered to all eligible employees beginning July 1, 2018. On November 1, 2018, WMH moved to a Reference Based Pricing Health Plan with stop loss coverage that operated as a self-insured plan. At all relevant times, the Health Plan provided medical benefits to full-time Company employees and their eligible dependents, and it was funded by employee contributions paid through payroll deductions and by employer contributions.

9. From June 1, 2018 to June 30, 2018, WMH sponsored a fully-insured health plan with Highmark Blue Cross Blue Shield ("BCBS") in order to continue the benefits from the prior owner of WMH. The Company then determined that it could not afford to maintain the fully-insured plan, and by memorandum dated September 11, 2018, Hatfield informed the Health Plan participants that WMH was "self-insured" for employee medical benefits effective July 1, 2018. Hatfield instructed employees to have their medical providers bill WMH directly and to have

their prescriptions filled at a local pharmacy owned by a member of WMH's controlling entity. By memorandum dated September 25, 2018, Hatfield informed employees that employee health care coverage was "completely self-insured" and that WMH would pay the same 80/20 allocation as under BCBS and in accordance with the BCBS plan documents. The self-insured Health Plan offered medical benefits from July 1, 2018 until October 31, 2018.

10. From November 1, 2018 through October 31, 2019, the Health Plan operated under a Reference Based Pricing ("RBP") model with stop loss coverage. The RBP model functioned like a self-insured plan, but instead of a network, the Health Plan used RBP which generally resulted in healthcare claims being paid at a fixed rate with participants responsible for 20% of repriced claims. EBSO, Inc. ("EBSO") was the Plan's third-party administrator who processed claims, drafted plan documents, and handled the day-to-day customer service.

11. From at least July 1, 2018 through September 21, 2019, Hatfield, engaged in a practice where he withheld employee contributions from Health Plan participants' paychecks and failed to forward these amounts to EBSO for payment by the Plan for medical costs incurred by the Plan's participants and beneficiaries and failed to otherwise pay claims incurred by Health Plan participants. Instead of remitting these withheld employee contributions to the Health Plan, Hatfield retained and commingled these Health Plan assets within the Company's general banking accounts so that these amounts could be used for purposes not related to the Health Plan.

12. On February 19, 2019, only 89 days after the start of the Health Plan, EBSO notified Hatfield that WMH was 60 days past due on funding of healthcare claims and that WMH was also at risk of being terminated by its stop loss carrier. Thereafter, Hatfield briefly corrected the funding deficiencies to stave off termination of benefits.

13. On June 4, 2019, EBSO sent Hatfield a notice that WMH was past due $135,219.04 for claims and administration fees dating back to February 2019 and that claims processing and benefits would be suspended until funding was received. EBSO further informed Hatfield that the Health Plan's stop loss coverage was at risk of termination due to non-payment of the May premium. On June 10, 2019, benefits and claims processing were suspended until WMH funded the February and March claims on June 20, 2019. Thereafter, funding problems were constant and claims processing and benefits were suspended three more times.

14. On July 25, 2019, August 30, 2019, and September 26, 2019, EBSO sent Hatfield 60-day formal notice of termination letters. Each letter informed Hatfield of the current outstanding balance of fees and claims, that benefits would be suspended, and that Hatfield had a fiduciary duty to notify participants of the reason for delay in the handling of their health claims.

15. On October 31, 2019, EBSO officially terminated the contract with WMH effectively eliminating coverage under the Health Plan.

16. Hatfield did not notify participants that their health coverage was terminated or in danger of being terminated until December 11, 2019 when WMH's human resources manager sent a memo to employees notifying them that as of October 25, 2019 the Company was no longer in a position to have health insurance, had no employer sponsored plan, and that employees should seek coverage through other means.

17. Hatfield withheld employee contributions from participant's pay for the period of July 1, 2018 through September 21, 2019. During this time, he failed to notify participants that Health Plan claims were unfunded and fees were unpaid, and that these might continue to go unfunded and unpaid resulting in cancellation of health benefits. As a result, participants and

beneficiaries reasonably believed they continued to be covered under the terms of the Health Plan when they were not.

18. Because of Hatfield's failure to notify participants and beneficiaries of his failure to fund the Health Plan during the period of July 1, 2018 through September 21, 2019, participants and beneficiaries continued to seek covered benefits under the mistaken belief that Health Plan coverage remained in place. The participants and beneficiaries were billed at least $703,398.44 for medical services that were uncovered due solely to the fact that they lacked insurance coverage as a result of the fiduciary's failure to fund the Health Plan.

## Causes of Action

## Count 1

**Fiduciary Breaches and Prohibited Transactions Relating to the Health Plan**

19. Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary re-alleges and adopts by reference the averments and allegations of paragraphs 1 through 18.

20. By the actions and conduct described in the paragraphs above, Hatfield, as fiduciary of the Health Plan:

    a. failed to discharge his duties with respect to the Health Plan solely in the interest of the participants and beneficiaries and:

        i. for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Health Plan, in violation of Section 404(a)(1)(A) of ERISA, 29 U.S.C. § 1104(a)(1)(A); and

        ii. with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B).

21. As a result of the fiduciary breaches of Hatfield, the Health Plan participants and beneficiaries incurred at least $703,398.44 for medical services that were uncovered due solely to the fact that they lacked insurance coverage because the fiduciary failed to fully fund the Health Plan.

22. As a result of the foregoing fiduciary breaches, the Health Plan's participants and beneficiaries are entitled to a surcharge remedy against Hatfield to compensate them for a loss in healthcare coverage and related expenses. 29 U.S.C. § 1132(a)(5).

## **Prayer for Relief**

WHEREFORE, the Secretary prays that this Court issue an order:

A. Removing Hatfield as fiduciary of the Health Plan and of any employee benefit plan for which he acts as a fiduciary;

B. Ordering Hatfield to restore to the Health Plan all losses, including interest, which were caused by his fiduciary misconduct;

C. Imposing a surcharge remedy on Hatfield to compensate the Health Plan participants and beneficiaries for all incurred medical expenses, healthcare claims, and other losses, including interest, which were caused by Defendant's fiduciary misconduct;

D. Permanently enjoining Hatfield from acting directly or indirectly, in any fiduciary capacity, with respect to any employee benefit plan subject to ERISA;

E. Permanently enjoining Hatfield from exercising any custody, control, or decision-making authority with respect to the assets of any employee benefit plan covered by ERISA;

F.      Barring Hatfield from engaging in any future violations of ERISA;

G.      Awarding the Secretary the costs of this action; and

H.      Ordering such further relief as the Court deems to be equitable and just.

Respectfully Submitted,

Mailing Address:

**UNITED STATES DEPARTMENT OF LABOR**

U.S. Department of Labor
Office of the Regional Solicitor
1835 Market Street
Mailstop SOL/22
Philadelphia, PA 19103-2968

Seema Nanda
Solicitor of Labor

Oscar L. Hampton III
Regional Solicitor

kooi.ryan.m@dol.gov
(215) 861-5130 (voice)
(215) 861-5162 (fax)

Usha Rengachary
Regional Counsel for ERISA

*/s/ Ryan M. Kooi*
Ryan M. Kooi
Trial Attorney
NJ 02829-2004; PA 94126

**WILLIAM S. THOMPSON**
**United States Attorney**
**Southern District of West Virginia**

*/s/ Jennifer M. Mankins*
Jennifer M. Mankins (W.Va. Bar No. 9959)
Assistant United States Attorney
United States Attorney's Office
300 Virginia Street East, Room 4000
Charleston, WV 25301

Phone: 304-345-2200
Fax: 304-347-5443
Email: jennifer.mankins@usdoj.gov

Attorneys for Plaintiff
U.S. Department of Labor